JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant, Lugene Scott ("Scott"), appeals his conviction. Finding no merit to the appeal, we affirm.
 {¶ 2} The Cuyahoga County Grand Jury returned a multiple count indictment against Scott, alleging two counts of felonious assault upon Donnie Davidson, violations of R.C. 2903.11(A)(1) and 2903.11(A)(2); two counts of felonious assault upon Damien Taylor, violations of R.C. 2903.11(A)(1) and 2903.11(A)(2); and one count of having a weapon while under disability, a violation of R.C. 2923.13(A)(3). The four counts of felonious assault included one-and three-year firearm specifications. Scott pled not guilty to the charges and the matter proceeded to a bench trial where the following evidence was presented.
 {¶ 3} On July 20, 2007, in the early evening (around 6:00 p.m.), Scott was hanging out on the front porch of a house located on Elizabeth Avenue in Cleveland, talking on his cell phone, when an argument erupted between Donnie Davidson (known as "Tez") and Tez's girlfriend, Toya. The argument attracted the attention of four teenage members of the Knowledge Youth Group, its executive director, Joyce Hood, and Hood's sister, Olivia Walton, who were all sitting outside on Hood's front porch across the street, making posters for an upcoming block party. The state offered the testimony of each eyewitness at trial. *Page 4 
 {¶ 4} The eyewitnesses all testified that Tez, who was drunk and yelling at Toya, became angry with Scott after Scott tried to calm him. The witnesses further testified that Tez walked over to Scott and punched him in the face, which Scott initially ignored. After Tez struck Scott a second or third time, a struggle ensued between the two, and Scott was "getting the best of Tez." At one point, Scott threw Tez down on the ground. From that point on, the eyewitness testimony slightly varied.[1]
 {¶ 5} Hood testified that, after Scott "got [Tez] down on the ground," she observed Scott also "go forward," downward, and then he stood up and shot Tez, who was standing approximately five feet away. Prior to Scott shooting Tez, Hood saw Tez reaching back around his waist.
 {¶ 6} Following the shooting, Hood immediately attempted to usher all of the children into the house. At this point, she heard another gunshot, turned around, and believed that Scott was shooting multiple shots into the ground near a row of bushes, but later discovered that he had shot Damien Taylor ("Taylor"). Hood described the shots as separate, distinct shots that were not rapidly fired.
 {¶ 7} Scott then walked across the street toward Hood, holding a gun in each hand, approaching Hood and saying, "Auntie, he tried to kill me. *** Auntie, they tried to hurt me." Hood attempted to retrieve the guns from Scott, *Page 5 
but, upon noticing Taylor lying on the ground across the street, she urged Scott to leave so that she could help Taylor.
 {¶ 8} Hood's sister, Olivia Walton, testified that Scott fired the gun twice at Tez. She testified that after the first shot, Tez responded by saying, "You going to shoot me, you going to shoot your boy." Scott then pointed the gun at Tez and fired the gun a second time. After the second shot, Walton observed Taylor come from the back of a neighboring house and walk between Scott and Tez with his hands up in the air. Scott then shot Taylor, who fell on his stomach. Scott shot Taylor at least two more times. Walton described the shots as "individual pops" that were not part of a rapid succession. She further corroborated Hood's testimony that Scott came across the street with the two guns and told Hood, "Auntie, they were going to kill me."
 {¶ 9} Rhemi Walton ("Rhemi"), a fifteen-year-old girl, testified that it appeared that Tez was reaching for a gun when he stood up after Scott had thrown him to the ground, and Scott responded by shooting Tez. She further testified that, immediately prior to the shooting and during the struggle, she heard something drop on the ground and then both Tez and Scott were reaching for something on the ground. Although Scott fired the gun at Tez, Rhemi was unsure whether the bullet actually hit Tez, but she heard Tez say, "I can't believe you really going to try to shoot me, you out of the M F'ing mind. I'll hurt you, ***." She further testified that she then observed Taylor coming from *Page 6 
across the street, leaving a known crack house. Upon reaching the area where Tez and Scott were standing, Taylor bent down and then reached up, holding both of his arms out, one toward Tez and one toward Scott. He appeared to have a gun in his hand, but Rhemi testified that she was not sure.[2] Next thing she knew, Scott was shooting and his "arm was jerking as if he was scared." Rhemi heard three shots fired at Taylor and then went inside the house. Once inside the house, Rhemi heard three more shots, which she described as being fired one to two seconds apart.
 {¶ 10} Sierra Boyd, a fourteen-year-old girl, testified that Scott shot Tez immediately after Tez reached into his pocket. She further testified that after Tez was shot, he dropped a gun, which Scott picked up. Boyd ran into the house after the first shot, wherein she heard five more gunshots. She corroborated Rhemi's testimony that Scott came across the street with the two guns in his hands, stating that he did not mean to do it.
 {¶ 11} Shania Coker, a 15-year-old girl, corroborated the other testimony that Scott shot Tez immediately after Tez stood up and started to reach for something. Coker also saw Scott shoot Taylor after Taylor came across the street and, according to Coker, was trying to end the altercation. She testified *Page 7 
that she did not see anything in Taylor's hands. She further indicated that she heard a total of seven gun shots.
 {¶ 12} Marcos Bryson, a 14-year-old boy, who was also present on Hood's porch the evening of the incident, was the last eyewitness to testify. He corroborated the testimony of the other teenagers that Tez was reaching for something when Scott pulled out a gun. Tez responded by saying, "You don't have to do this." Scott then shot Tez. Following the shot, Bryson ran inside Hood's house. He heard more shots, and, upon looking outside, he saw Taylor lying face-down in the driveway across the street.
 {¶ 13} The state also presented the testimony of Taylor, the second gunshot victim, who testified that he grew up with Tez. He further stated that after he heard the gunshot, he ran across the street to assist Tez and "to get Tez to safety." Upon reaching Tez and Scott, Scott told him, "If you with him, you're going to get it, too." At this time, Taylor was holding his right hand in front of his face. Scott shot Taylor's right hand and the next thing Taylor remembers was waking up in the hospital. Taylor denied having a gun on him.
 {¶ 14} The state further offered the testimony of the Cleveland police officers and detectives who responded to the scene and handled the investigation. At the scene, the police recovered one "spent" bullet in a pool of blood on the driveway and five spent .25 caliber shell casings. Testimony was also offered that the police discovered a live round and multiple shell casings *Page 8 
surrounding Taylor's body and a plastic bag of suspected narcotics underneath Taylor when EMS personnel rolled him onto a stretcher.
 {¶ 15} The police testified that Scott voluntarily surrendered himself when they located him on Reno Avenue, a street nearby Elizabeth Avenue. (The record reveals that Scott had telephoned 911, reported the incidents, and asked for police assistance.) After taking Scott into custody, the police located a nine millimeter handgun, which had a magazine, and a .25 caliber handgun in a wooded area close to the scene of the crime. Although the .25 caliber handgun did not have a magazine, one was found nearby. Detective James Raynard, the detective assigned to processing the crime scene, testified that both guns had a round in the chamber. Det. Raynard further testified that he swabbed both guns for DNA and forwarded the swabs to the forensic laboratory for further analysis. He also lifted four latent fingerprints from the nine millimeter handgun and one latent fingerprint from the .25 caliber handgun. The prints were determined to be of insufficient quality to identify or make any comparisons.
 {¶ 16} Detective Arthur Echols testified that he took Scott's written statement. Det. Echols read the statement into the record, indicating that Scott admitted to shooting Tez one time and Taylor six times. Scott told Echols that he shot Taylor six times because "that's how many went off when I pulled the trigger." *Page 9 
 {¶ 17} The state further offered testimony that Tez had sustained a single gunshot wound to his right lower hip area. The state corroborated the gunshot wound with Tez's medical records. The state also offered testimony that Taylor had sustained three gunshot wounds, one to his right wrist, one to his neck, and one to his back.
 {¶ 18} On cross-examination, Det. Echols acknowledged that Tez was indicted for carrying a concealed weapon based on his involvement in the altercation with Scott, which resulted in his being shot.
 {¶ 19} Scott testified in his own behalf. According to Scott, Tez was extremely intoxicated and attacked him on the evening of July 20, 2007. While Scott was sitting on the front porch of Tez's mother's house and talking on the phone to his mother, Tez began fighting with Toya, hit her, and then started throwing punches at Scott. After he started punching Scott, a struggle ensued, leading Tez and Scott off of the porch and into the street. Defending himself, Scott punched Tez, and Tez landed on the ground. Upon falling, Tez's gun (.25 caliber handgun) fell from his possession, and Scott grabbed the gun. Next, Tez "rushed towards" Scott, at which time Scott "stepped back[,] shot down at the ground[,] and told [Tez] to back up." Tez responded by hopping up and down and yelling, "You shot me, you shot me."
 {¶ 20} Immediately following the shot, Taylor "came out of nowhere," running toward him. Taylor asked Tez whether Scott had shot him, and Tez *Page 10 
answered, "Yeah." Taylor responded by saying, "Huh," and then pulled a gun from his waist and attempted to hand the gun to Tez, which was pointed toward Scott's general direction. Upon seeing the gun pointed in his direction, Scott started "squeezing, shooting the gun at [Taylor]." Taylor fell to the ground but was still holding his gun and "still moving." Scott continued to shoot until the gun had no more bullets. He testified that the whole event transpired very quickly and that he was "terrified" throughout the encounter.
 {¶ 21} After shooting Taylor, Scott retrieved Taylor's gun from Taylor's hand and ran across the street to Hood's house with both guns in his hands, stating that Tez and Taylor were going to kill him. After Hood told him to get away from the house, Scott ran to a nearby field where he called the police on his cell phone. Once the police arrived, Scott told them where to find the guns.
 {¶ 22} Scott also testified that he was on community control sanctions at the time that the underlying shootings occurred and that he had previously been convicted for complicity and drug possession in 2003.
 {¶ 23} Of the first two counts of the indictment — felonious assault upon Donnie Davidson ("Tez") — the trial court found Scott not guilty but guilty of the lesser included offense of aggravated assault. The trial court found Scott guilty of the remaining counts and the firearm specifications, and sentenced him to a total prison term of 12 years.
 {¶ 24} Scott appeals, raising the following two assignments of error: *Page 11 
 {¶ 25} "[I.] The defendant's conviction was against the manifest weight of the evidence.
 {¶ 26} "[II.] The defendant was denied effective assistance of counsel."
 Manifest Weight of the Evidence {¶ 27} In his first assignment of error, Scott argues that his conviction is against the manifest weight of the evidence. He contends that the trier of fact lost its way because the totality of the circumstances revealed that he acted in self-defense.
 {¶ 28} In State v. Thompkins (1997), 78 Ohio St.3d 380, at 387, the Ohio Supreme Court explained:
 {¶ 29} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *** Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *** Weight is not a question of mathematics, but depends on its effect in inducing belief" (Emphasis in original.) (Internal citations omitted.)
 {¶ 30} After reviewing the entire record, weighing the evidence and all reasonable inferences, considering the credibility of witnesses, and conflicts in the evidence, we do not find that Scott's convictions were such that "the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that *Page 12 
the conviction must be reversed and a new trial ordered." SeeThompkins, supra.
 {¶ 31} Scott contends that his convictions of aggravated assault and felonious assault are against the manifest weight of the evidence because he was justified in using force and had no opportunity to retreat. He further maintains that because he acted in self-defense, his conviction for having a weapon while under disability cannot stand. We disagree.
 {¶ 32} Under Ohio law, self-defense is an affirmative defense, which the defendant must prove by a preponderance of the evidence.[3]State v. Martin (1986), 21 Ohio St.3d 91, affirmed Martin v. Ohio
(1987), 480 U.S. 228. To establish self-defense, the defendant must demonstrate that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid danger. State v. Williford (1990),49 Ohio St.3d 247; see, also State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Since Ohio has a subjective test to determine whether a *Page 13 
defendant acted in self-defense, the defendant's state of mind is a crucial issue. State v. Koss (1990), 49 Ohio St.3d 213, at 215.
 {¶ 33} Although the record clearly evidences that Scott was not at fault in creating the situation that gave rise to the affray between him and Tez, we find that Scott failed to satisfy the second and third prongs of the test. All of the eyewitnesses to the incident testified that Scott had the upper hand in the fight that ensued between him and Tez and that Scott was "getting the best of Tez," who was severely intoxicated and had been thrown down on the ground by Scott. As for Scott's claim that he feared for his life and that his use of force was necessary when Tez stood up, reached for "something," and thrust toward him, this claim is not supported by the record.
 {¶ 34} Although some of the eyewitnesses testified that it appeared that Tez was reaching for something, possibly a gun, Scott did not believe that Tez was reaching for a gun. To the contrary, Scott testified that he retrieved Tez's gun when it fell onto the ground. And even if Tez had thrust toward Scott, there was nothing preventing Scott from retreating. The record reflects that Scott was at least five feet away from Tez when he shot him. Given that Scott possessed Tez's gun and had easily overtaken Tez in the initial altercation that arose, it was not reasonable for him to believe that he had to shoot Tez to protect himself. Further, after Scott had acquired Tez's gun, and given the distance between the two, there was simply no reason why he could not have retreated down the *Page 14 
street. Accordingly, we find that Scott failed to demonstrate that he acted in self-defense in shooting Tez.
 {¶ 35} Next, as for the felonious assaults relating to Taylor, we likewise find that Scott failed to demonstrate that he acted in self-defense. Here, even if the trier of fact discredited Taylor's testimony, namely, that he ran out unarmed and attempted to get Tez to safety, and the trier of fact ignored eyewitness testimony that Taylor ran out with his arms out, attempting to break up the fight, Scott's testimony alone failed to demonstrate that he acted in self-defense. Scott cannot escape the fact that he was at fault for the affray that arose between him and Taylor. Scott's testimony revealed that Taylor approached Scott only after Scott shot Tez. Taylor's involvement stemmed directly from the preceding shooting.
 {¶ 36} Secondly, even if Scott initially feared for his life when Taylor arrived on the scene, allegedly holding a gun, Scott's belief was no longer reasonable and his continued use of force was no longer justified when Taylor fell on his stomach with his back facing Scott. Despite Taylor obviously no longer posing a threat, Scott admitted that he continued to walking toward Taylor, firing the gun at him, and shooting him twice more, including in his back. Thus, Scott could have easily ran away after Taylor was down on the ground, and the continued use of the force was not justified. *Page 15 
 {¶ 37} Finally, having found that Scott did not act in self-defense in regard to either Tez or Taylor, and given that the State proved that Scott had previously been convicted of a felony for drug possession, we find that his conviction for having a weapon while under disability is supported by the evidence. See, e.g., State v. Lanier, 2nd Dist. No. 2007-CA-77, 2008-Ohio-4018; State v. Hill (July 10, 1997), 8th Dist. No. 70930.
 {¶ 38} Scott's first assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 39} Scott contends in his second assignment of error that he was denied effective assistance of counsel because his defense counsel failed to seek a continuance of the trial in order to obtain the DNA evidence regarding who handled the two firearms at issue.
 {¶ 40} We review a claim of ineffective assistance of counsel under the two-part test set forth in Strickland v. Washington (1984),466 U.S. 668. Under Strickland, a reviewing court will not deem counsel's performance ineffective unless a defendant can show his lawyer's performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of the syllabus. To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings *Page 16 
would have been different. State v. Sallie, 81 Ohio St.3d 673, 674,1998-Ohio-343.
 {¶ 41} In reviewing a claim of ineffective assistance of counsel, it must be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. State v. Smith (1985),17 Ohio St.3d 98; Vaughn v. Maxwell (1965), 2 Ohio St.2d 299. Further, "debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel." State v. Clayton (1980),62 Ohio St.2d 45.
 {¶ 42} Here, Scott complains of his defense counsel's failure to obtain the DNA results from the handguns for purposes of identifying who handled them. He argues that this evidence would have been critical to his entire defense because it corroborated his claim that he acted in self-defense. But his counsel's decision not to postpone the trial to obtain the DNA results was a tactical decision. Indeed, the DNA results may have been inconclusive or may have gone against Scott's claim that Tez and Taylor each had a gun. Conversely, even without the DNA results, Scott's trial counsel effectively presented testimony that both Tez and Taylor handled the guns, thereby supporting Scott's self-defense theory. Additionally, one eyewitness told the police that Tez had a gun, and another eyewitness reported to the police that Taylor was holding a gun when he ran across the street. Because it is well established that trial tactic decisions do not constitute a deprivation of effective counsel, Scott has failed to *Page 17 
demonstrate deficiency or ineffectiveness. See Clayton, supra; see, also, State v. Phillips, 74 Ohio St.3d 72, 85, 1995-Ohio-171, certiorari denied (1996), 517 U.S. 1213.
 {¶ 43} In addition, Scott fails to demonstrate how he was prejudiced and how the outcome of the trial would have been different if his counsel had obtained the DNA results. Assuming that the DNA results would have demonstrated that Tez and Taylor each handled one of the guns, the evidence still established that Scott did not act in self-defense when he shot them. As discussed above, Scott testified that he immediately retrieved Tez's gun once it was dropped. The evidence further revealed that there was nothing preventing Scott from running away from Tez once he retrieved the gun. Likewise, the situation between Scott and Taylor arose as a result of Scott shooting Tez. His actions directly gave rise to the affray, thereby negating his self-defense claim against Taylor. Further, even if Scott initially feared that Taylor would shoot him, Scott's fear was no longer reasonable, and his continued use of force was not justified, when Taylor fell to the ground on his stomach.
 {¶ 44} Accordingly, we overrule the second assignment of error.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
 The Court finds there were reasonable grounds for this appeal. *Page 18 
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., J., CONCURS; MELODY J. STEWART, P.J., CONCURS IN JUDGMENT ONLY
[1] Not all the eyewitnesses observed the entire chain of events. The testimony stated reflects what the witness observed or heard.
[2] In her statement to the police, Rhemi told the police that she believed Taylor had picked up a gun on the ground and was holding it in his right hand. At trial, she acknowledged that she told the police this, but she testified that she was not sure what was in Taylor's hand.
[3] A preponderance of the evidence is "the greater weight of the evidence * * *. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed." Brothers v. Morrone-O'Keefe Dev. Co.,LLC, 10th Dist. No. 06AP-713, 2007-Ohio-1942, ¶ 49, citing Manogg v.Stickle (Dec. 29, 1999), Licking App. No. 99CA56; see, also, Ohio Jury Instructions CR. (2008), Section 417.29. *Page 1