[Cite as *R.S. v. G.S.*, 2026-Ohio-1283.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| R.S., | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115476 |
| v. | : | |
| G.S., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED AND REMANDED
**RELEASED AND JOURNALIZED:** April 9, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DV-25-404336

*Appearances:*

Viktoriya Dyrda and Patrick Dichiro, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} G.S. brings this appeal challenging the domestic-relations division's issuance of a domestic-violence civil-protection order ("DVCPO"). We find merit to G.S.'s appeal, vacate the issuance of the DVCPO, and remand to the trial court to notify the entities that had been previously served with the DVCPO that it is no longer in effect.

# I. Procedural History

{¶ 2}    R.S. filed a petition for a DVCPO on May 1, 2025, against her brother, G.S., with whom she shares a mother.  An ex parte emergency protection order was issued that same day until a full hearing could be held.  Following the full hearing at which both R.S. and G.S. were present, the magistrate issued the DVCPO.  G.S. filed several objections.  The court overruled G.S.'s objection and reiterated that the DVCPO issued on May 29, 2025, remained in effect.  From this order, G.S. filed this appeal.  R.S. has not filed a responsive brief or otherwise appeared in this matter.

# II. Factual History

{¶ 3}    R.S.'s initial DVCPO petition provided, verbatim:

The first time the abusive actions occurred were in the summer of 2024, either June or July, when I called the Brecksville Police Department because [G.S.] was forcefully knocking on my kitchen window then attempted to open it.  I was on the phone with the dispatchers until the police arrived.  My daughters were present at the time and afraid.  I did not answer [G.S.'s] phone calls that day so he felt that he could come to my home and demand what he wanted from me that day (my mother's purse that had a set of keys he needed).  The police told him not to return to my property or he would be arrested.  Most recently on 04/30/2025 [G.S.] called me to inquire about alleged money I owed him from my mother's] estate.  I explained to him that I had to pay my attorney's [sic] and I did not have the money, at that point he started screaming at me and saying "I am going to kill you you stupid bitch" then he hung up on me.  I felt very scared because this is not the first time he has said this to me and I know he has several firearms.  I also know he is an alcoholic and can be unpredictable.  He continued to call me several times saying things like "just wait until your trial, you'll never get your kids back". He also kept texting me that if I do not pay him $20,000 by Friday 05/02/2025 he will be pressing "criminal charges against me".  I am not sure where any of this is coming from because I inherited $80,000 from my mother['s] estate and I am not obligated to give him money.  I am fearing for my life and my safety.  [G.S.] has this pattern of behavior and I am taking action this time.

{¶ 4} The petition further provided that G.S. had a history of violent behavior and alcohol abuse and that bipolar disorder ran in their family. She alleged that G.S. had consistently refused treatment for these mental-health issues. R.S. also indicated that G.S. possessed several firearms and that on numerous occasions, G.S. had threatened to kill himself and had threatened to kill her, the most recent threat against her occurring on April 30, 2025.

{¶ 5} After the ex parte protection order was issued, a magistrate held a full hearing on the DVCPO petition on May 27, 2025. R.S. appeared pro se, and G.S. appeared with counsel.

{¶ 6} In her case-in-chief, R.S. explained that she was currently involved in a costly divorce and did not have custody of her children. Her and G.S.'s mother passed away in December 2023. In April 2025, G.S. called her and requested attorney fees associated with probating their mother's estate, to which she responded that she was unable to pay. "And that is when [G.S.] said that he would kill me and [] he hung up the phone and started calling me back over and over again." (Tr. 18.) According to R.S., G.S. also made threats suggesting that he would sabotage her efforts to regain custody of her children. The next day, she filed the petition for a DVCPO. She did not present any exhibits but spoke of an incident that had occurred in the summer of 2024 where G.S. attempted to enter her house through a window, allegedly to retrieve a set of keys that R.S. inadvertently retained because the keys were in her mother's purse. The Brecksville police intervened, and G.S. was not arrested. R.S. rested and requested a five-year protection order.

{¶ 7} G.S.'s attorney cross-examined R.S. Exhibit A was introduced as a police report from September 2023. The police report indicated that R.S. was found dancing in a Home Depot parking lot while her minor children were with her. She was released into G.S. and his wife's care following the incident and advised to seek medical attention.

{¶ 8} Exhibit B consisted of several checks indicating that G.S. had paid over $20,000 to Stafford Law for R.S.'s divorce expenses, one of which R.S. indicated came from their mother's estate. R.S. admitted that she had not yet repaid G.S. for these expenses.

{¶ 9} When presented with Exhibit C, R.S. acknowledged that it was a credit card statement showing charges to G.S.'s credit card. R.S. admitted that she had used G.S.'s credit card for approximately two weeks without G.S.'s permission and had not paid him back for these transactions. She acknowledged that G.S. previously authorized her to use his credit card to purchase Christmas gifts for R.S.'s children, which was how she had his credit card information.

{¶ 10} Exhibit D was a police report from July 2024 that G.S. had filed in his capacity as the executor of their mother's estate. The police report indicated that R.S. entered her late mother's home and removed "valuable items" from the estate without authorization. (Tr. 31.)

{¶ 11} Exhibit E contained several check images pertaining to an incident where R.S. altered checks written to her by G.S., changing one check from $1,500 to $7,500. R.S. explained that this occurred during a manic episode.

{¶ 12} During the remainder of R.S.'s cross-examination, she was asked whether she filed this petition for a DVCPO "just a few days after [G.S.] confronted [R.S.] about repaying him for all the money that he lent you?" – to which she responded, "That's one way to look at it." (Tr. 34-35.) R.S. denied that she filed the petition for DVCPO in an attempt to evade paying back G.S.

{¶ 13} G.S. then presented his case, first testifying in his own defense. He stated that he is a husband and a father and has run his family's meat market for over 20 years. Prior to R.S. filing for a DVCPO, G.S. felt that their relationship was loving and caring. When asked why he decided to help his sister financially, he responded that "I love my sister and I've always been there for her." (Tr. 42.) G.S. denied ever threatening R.S. or her children. He testified that she likely made these accusations because "she's upset that she's going to have to pay this money back and she's trying to get out of it" and indicated that he had recently confronted her about paying him back. (Tr. 47.) He further indicated that their late mother's home had sold about six or eight weeks ago and that R.S. had received funds from this sale. According to G.S., R.S. sent him a text stating that she was going to bring him a check. He testified that this proceeding has affected him significantly, citing his community reputation, hiring an attorney, collecting documents, and that his global entry had been revoked and that he was required to surrender firearms that he legally possessed. R.S. did not cross-examine her brother.

{¶ 14} G.S.'s wife testified about G.S.'s character. She testified that she had never known him to be violent, aggressive, or threatening and especially not towards

R.S. She said that G.S. voluntarily helped R.S. emotionally and financially for many years and had never done anything indicating that he would harm her. When asked if she had an opinion regarding R.S.'s motivation in petitioning for a DVCPO, she responded, "The best guess that I have is to get out of paying [G.S.] the money that she owes him, or she's having another manic episode." (Tr. 58.)

{¶ 15} After G.S. concluded, the court admitted all exhibits over R.S.'s objection. Two days later, the magistrate issued the requested DVCPO until May 1, 2027. G.S. filed objections and then supplemented the objections after the transcript became available, which were overruled. G.S. filed the instant appeal and assigned two errors for our review:

> I. The trial court erred when it granted appellee's petition for a domestic violence civil protection order where the decision was against the manifest weight of the evidence because appellee failed to meet her burden of proof.

> II. The trial court erred and abused its discretion in expanding the scope of the civil protection order to preclude appellant from possessing, using, carrying or obtaining any deadly weapon.

{¶ 16} To issue a DVCPO, the trial court "must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34 (1997), paragraph two of the syllabus, citing R.C. 3113.31(D). Pertinent to this appeal, the statute defines "domestic violence" as "[p]lacing [a family or household member] by the threat of force in fear of imminent serious physical harm . . . ." R.C. 3113.31(A)(1)(a)(ii). "A preponderance of the evidence is 'the greater weight of the evidence * * *. A preponderance means evidence that is more probable,

more persuasive, or of greater probative value. It is the quality of the evidence that must be weighed.'" *State v. Scott*, 2008-Ohio-6847, ¶ 32, fn. 3 (8th Dist.), quoting *Brothers v. Morrone-O'Keefe Dev. Co.*, 2007-Ohio-1942, ¶ 49 (10th Dist.). "[W]hen the question on appeal [involves] the trial court's decision to grant or deny a [DVCPO] . . . our standard of review is whether there was sufficient, credible evidence to support a finding that the respondent engaged in . . . acts of domestic violence . . . against the petitioner." *S.M. v. T.G.*, 2025-Ohio-1448, ¶ 26 (8th Dist.), citing *Reynolds v. White*, 1999 Ohio App. LEXIS 4454, *10 (8th Dist. Sept. 23, 1999).

{¶ 17} G.S. argues that the court erred in issuing the DVCPO because R.S. presented "no evidence of any act of domestic violence" except for "her testimony that she received a phone call whereby [G.S.] had allegedly threatened her life." G.S. argues that R.S. did not present sufficient, credible evidence demonstrating that he engaged in acts of domestic violence. We agree.

{¶ 18} When R.S. presented her case, she alleged that G.S. called her and threatened her with violence. While she noted that G.S. owns several firearms, she did not allege that G.S. had threatened to use any of these firearms against her or her children. She referred to an incident where G.S. allegedly attempted to enter her home through the window in the summer of 2024. She also generally referred to G.S. being violent in the past. R.S. did not refute any of the information contained in G.S.'s exhibits, except she corrected that a check originating from her mother's estate drawn by Stafford Law was not G.S.'s money. In response to the incident

occurring at Home Depot and the altered-check incident, R.S. admitted to the activities but stated that manic episodes contributed to the behavior.

{¶ 19} In contrast, G.S. testified on his own behalf and denied that he had ever threatened R.S. Next, G.S.'s wife testified on his behalf and denied having knowledge of G.S.'s alleged threats towards R.S. On the contrary, G.S.'s wife continued that she had never known G.S. to be violent and, in fact, did not think he was capable of the allegations in the petition. G.S. introduced numerous exhibits demonstrating the nature of R.S. and G.S.'s relationship that demonstrated G.S.'s choice to personally and financially support his sister and her children because of his family values. R.S. was released into his care after a mental-health-related episode at Home Depot, and when R.S. allegedly stole several items from their mother's estate, he did not elect to press charges. Moreover, G.S.'s testimony indicated that he had recently asked his sister to repay him a substantial sum of money, and this petition followed shortly thereafter. He surmised that she filed this petition to avoid repaying him.

{¶ 20} R.S.'s petition leveled serious accusations against her brother. In support of these accusations, R.S. offered only her own testimony. While we are cognizant that "[o]ften, the only evidence of domestic violence is the testimony of the victim," *Felton*, 79 Ohio St.3d at 44, we note that R.S.'s testimony, in this matter, was insufficient to conclude that she was in danger of domestic violence under R.C. 3113.31. Her testimony articulated that G.S. had threatened her and her custody of her children whereas G.S. introduced ample evidence suggesting that he actually

supports her and her children. She revealed that G.S. owned several firearms but did not connect his gun ownership to any threats or violent incidents; she merely testified that G.S. owns a gun. She cited a police-involved incident, but the incident was from the summer of 2024 — nearly a year prior to filing her petition. Her petition indicated that G.S. had sent her threatening text messages, yet none were introduced or even discussed at trial. Her petition also indicated that she did not need to borrow money from G.S. because she had her own money, but G.S. presented evidence directly impeaching this statement and instead establishing that he had recently asked R.S. to repay him for his financial support. Based on the evidence presented, we conclude that the record does not contain sufficient, credible evidence that R.S. was in danger of domestic violence pursuant to R.C. 3113.31. Accordingly, we vacate the trial court's issuance of the DVCPO.

{¶ 21} G.S.'s second assignment of error is premised on this court finding that the DVCPO was properly issued. The assigned error suggests that even if we find that the DVCPO was properly issued, its provisions relating to firearms are overly broad. Here, however, because we have concluded that the DVCPO was improperly issued, we disregard the second assignment of error as moot. *See* App.R. 12(A)(1)(c).

{¶ 22} Judgment vacated, and case remanded to ensure that all entities, agencies, or authorities who had received the DVCPO are notified that it has been vacated.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

MICHELLE J. SHEEHAN, A.J., and
MARY J. BOYLE, J., CONCUR