[Cite as *Allan v. Allan*, 2014-Ohio-5039.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 101212**

**NEVEAN ALLAN**

PETITIONER-APPELLEE

vs.

**NAFIZ ALLAN**

RESPONDENT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DV-13-347921

**BEFORE:** Boyle, A.J., Keough, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** November 13, 2014

**ATTORNEY FOR APPELLANT**

Brent L. English
Law Offices of Brent L. English
820 Superior Avenue West, 9th Floor
The 820 Building
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

Kaitlyn D. Arthurs
Richard A. Rabb
McCarthy Lebit Crystal & Liffman Co.
101 West Prospect
Suite 1800
Cleveland, Ohio   44115

MARY J. BOYLE, A.J.:

{¶1} Respondent-appellant, Nafiz Allan ("Nafiz"), appeals from a judgment overruling his objections and issuing a domestic violence civil protection order ("CPO") to petitioner-appellee, Nevean Allan ("Nevean"), and Nevean's and Nafiz's five minor children for a period of five years. He raises two assignments of error for our review:

1. The trial court erred in adopting a magistrate's decision despite timely and detailed objections thereto where the evidence did not support a finding of a pattern of a threat of domestic violence and where no proof was offered that the five minor children were subjected to domestic violence.

2. The trial court abused its discretion, assuming a CPO could have been granted in favor of the parties' five minor children, to extend the CPO for five years under the facts of this case[.]

{¶2} Finding no merit to his arguments, we affirm.

Procedural History

{¶3} On January 2, 2013, Nevean called police and alleged that her husband, Nafiz, had committed domestic violence against her. On January 3, Nafiz was arrested and charged with domestic violence (including a furthermore clause that he had previously been convicted of assault with the victim being a family or household member; the victim was Nevean). Nafiz was also charged with five counts of child endangering and disrupting public services.

{¶4} On January 3, 2013, Nevean filed a complaint for divorce in the Cuyahoga County Domestic Relations Court.

{¶5} On January 4, 2013, Nevean obtained a temporary protection order ("TPO") from the common pleas court in the criminal case pursuant to R.C. 2919.26, protecting herself and the five minor children that she and Nafiz had during their marriage. The issuance of a TPO is a pretrial condition of release of the alleged offender from jail during the pendency of the criminal

proceedings.   R.C. 2919.26(A)(1).

{¶6}   On June 6, 2013, Nafiz pleaded guilty to an amended charge of attempted domestic violence, a fifth-degree felony.   The remaining charges were nolled.   Nafiz received two years of community control sanctions as his sentence.   As part of Nafiz's community control sanctions, he was ordered to not have any contact with Nevean.   At the close of the criminal case, the TPO dissolved pursuant to R.C. 2919.26(E)(2)(a).[1]

{¶7}   On July 18, 2013, Nevean filed a petition for a CPO in Cuyahoga County Domestic Relations Court against Nafiz pursuant to R.C. 3113.31.   She was granted an ex parte CPO that same day, protecting herself and the five minor children.

{¶8}   A magistrate held a full hearing on the matter on August 20, 2013.   The magistrate found that Nevean established by a preponderance of the evidence that Nafiz committed acts of domestic violence against her and the five children as defined in R.C. 3113.31.   In this appeal, however, Nafiz does not challenge the magistrate's finding regarding Nevean because, as he acknowledges, he "entered a plea to the criminal charge of domestic violence" as to Nevean.   Nafiz does challenge the magistrate's findings regarding the parties' five children. The magistrate made the following findings regarding the children:

> Petitioner proved, by a preponderance of the evidence, that Respondent committed an act or acts of domestic violence as defined in R.C. 3113.31 when he pounded the bed against the wall with enough force to break the bed.
>
> The Magistrate finds that Petitioner proved, by a preponderance of the evidence, that Respondent placed another by threat of force in fear of imminent serious physical harm (R.C. 3113.31(A)(1)(b)).   The Magistrate finds that Respondent engaged in a pattern of conduct that constituted a threat of force that eventually

---

[1]R.C. 2919.26(E)(2) provides that a TPO that is issued as a pretrial condition of release in a criminal case is effective only until (a) the criminal case ends, or (b) a CPO is issued under R.C. 3113.31 "arising out of the same activities as those that were the basis" of the criminal complaint.

placed Petitioner in fear of imminent serious physical harm for both herself and the parties' children.

The Magistrate further finds that Petitioner proved, by a preponderance of the evidence, that Respondent violated [R.C. 3113.31 (A)(1)(c)] by committing an act with respect to a child that would result in a child being an abused child as defined in [R.C. 2151.031].

* * *

The Magistrate finds that Petitioner did prove, by a preponderance of the evidence, that Respondent recklessly created a substantial risk to the health and safety of the children [under R.C. 2919.22(A)] during the incident which occurred when the children were on the bed in the parties' bedroom.

{¶9} As part of the CPO, the magistrate granted Nevean temporary parental rights and responsibilities, but noted that "temporary custody [is] subject to any orders issued" in the parties' divorce case. Regarding visitation orders in the CPO, the magistrate stated, "[t]he issue of visitation shall be addressed" in the divorce case.

{¶10} Nafiz filed objections to the magistrate's decision, which the trial court overruled. The trial court adopted the magistrate's decision in full and ordered that a CPO be issued to Nevean for a period of five years, protecting Nevean as the petitioner and listing the five children as "petitioner's family or household members" who are "persons protected by this order." It is from this judgment that Nafiz appeals.

Standard of Review

{¶11} When reviewing a challenge to a CPO, our standard of review depends on the nature of that challenge. *Abuhamda-Sliman v. Sliman*, 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453, ¶ 9 (8th Dist.). In *Reynolds v. White*, 8th Dist. Cuyahoga No. 74506, 1999 Ohio App. LEXIS 4454, at *10-11 (Sept. 23, 1999), after noting that there has been some inconsistency among the appellate courts, we explained our standard of review as follows:

Because R.C. 3113.31 expressly authorizes the courts to craft protection orders that are tailored to the particular circumstances, it follows that the trial court has discretion in establishing the scope of a protection order and that judgment ought not be disturbed absent an abuse of discretion. When the issue is whether a protection order should have issued at all, however, the resolution of that question depends on whether the petitioner has shown by a preponderance of the evidence that the petitioner or the petitioner's family or household member was in danger of domestic violence. [*Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997)], paragraph two of the syllabus. The *Felton* court held that there was "sufficient, credible evidence to prove by a preponderance of the evidence that appellee had engaged in acts of domestic violence," without expressing any view as to whether the lower court abused its discretion. It is reasonable to infer from *Felton* that when a respondent contends that it was error to issue a protection order, the question on review is whether there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence. *See Felton* at 43-44; [*Sroka v. Sroka,* 121 Ohio App.3d 728, 730, 700 N.E.2d 916 (8th Dist.1997)].

{¶12} In Nafiz's first assignment of error, he argues that the CPO should not have been granted with respect to the children. Thus, we must determine whether there was sufficient credible evidence to support a finding that he engaged in acts or threats of domestic violence against the children.

{¶13} In Nafiz's second assignment of error, however, he challenges the scope of the CPO, namely, its duration. Therefore, we review his second assignment of error for abuse of discretion.

R.C. 3113.31

{¶14} The General Assembly enacted the domestic violence statutes specifically to criminalize those activities commonly known as domestic violence and to authorize a court to issue protection orders designed to ensure the safety and protection of a complainant in a domestic violence case. *Felton v. Felton*, 79 Ohio St.3d 34, 37, 679 N.E.2d 672 (1997). A petitioner seeking a CPO must demonstrate by a preponderance of the evidence that the petitioner

or the petitioner's family or household members are in danger of domestic violence. *Id.* at paragraph two of the syllabus.

{¶15} R.C. 3113.31(A)(1) defines domestic violence to include one or more of the following acts:

(a) Attempting to cause or recklessly causing bodily injury;

(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of Section 2903.211 or 2911.211 of the Revised Code;

(c) Committing any act with respect to a child that would result in the child being an abused child.

{¶16} Here, the magistrate found that Nevean established by a preponderance of the evidence that Nafiz committed domestic violence because he engaged in a pattern of conduct that constituted a threat of force that placed Nevean in fear of imminent serious physical harm for both herself and the five children.

{¶17} Where a trial court grants a CPO based on a petitioner's fear of imminent serious physical harm, "the critical inquiry under [R.C. 3113.31] is whether a reasonable person would be placed in fear of imminent (in the sense of unconditional, non-contingent), serious physical harm." *Strong v. Bauman*, 2d Dist. Montgomery No. 17256, 1999 Ohio App. LEXIS 2272 (May 21, 1999). "Threats of violence constitute domestic violence for the purposes of R.C. 3113.31 if the fear resulting from those threats is reasonable." *Lavery v. Lavery*, 9th Dist. Summit No. 20616, 2001 Ohio App. LEXIS 5360, *4 (Dec. 5, 2001). The reasonableness of the fear may be determined with reference to the history between the petitioner and the respondent. *Id.* at *4-5, citing *Eichenberger v. Eichenberger*, 82 Ohio App.3d 809, 816, 613 N.E.2d 678 (10th Dist.1992).

{¶18} Nafiz does not argue the "threat of force" element in R.C. 3113.31(A)(1)(b). Thus, we must first determine whether Nevean's fear of imminent serious physical harm for herself and her children was reasonable.

{¶19} The magistrate also found that Nevean established by a preponderance of the evidence that Nafiz committed domestic violence against the children under R.C. 3113.31(A)(1)(c) because they were "abused" children. The magistrate specifically found that the children were abused because they were "endangered children" as defined in R.C. 2151.031(B) and 2919.22(A).

{¶20} R.C. 2151.031(B) defines an "abused child" in relevant part as including any child who "[i]s endangered as defined in Section 2919.22 of the Revised Code[.]" R.C. 2919.22(A) states in pertinent part that "[n]o person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

{¶21} "Substantial risk" is defined in R.C. 2901.01(A)(8) as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." *See State v. G.G.*, 10th Dist. Franklin No. 12AP-188, 2012-Ohio-5902, ¶ 8. Further, the culpable mental state for criminal child endangering under R.C. 2919.22(A) is recklessness. *State v. Davis*, 2d Dist. Clark No. 08CA0117, 2010-Ohio-5279, ¶ 58. Recklessness is defined in R.C. 2901.22(C):

> A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

**{¶22}** Thus, the second issue that we must determine is whether Nafiz recklessly created a substantial risk to the health or safety of the five children.

## Full Hearing

**{¶23}** At the full hearing, the following testimony was presented.

**{¶24}** Dave Woehrman, a police officer for the city of North Olmsted, testified that he went to the Allan home on January 2, 2013, around 12:35 p.m. Officer Woehrman testified that Nevean told him that she and Nafiz began verbally arguing around 6:15 a.m., but then it became physical. Nevean told Officer Woehrman that Nafiz slapped her in the face and choked her. Officer Woehrman observed Nevean's "face and she had a mark on her face and * * * there was a red mark on her neck also." Officer Woehrman left the house, but returned ten minutes later with an evidence technician, who took photos of the marks on Nevean's face and neck, as well as the many items that were broken in the home.

**{¶25}** Nevean testified that she lived with Nafiz and their five children, ages 18 months to 13 years old. Nevean explained that on January 2, 2013, around 6:00 a.m., she was sleeping in her bed. Nevean stated that Nafiz had slept on the couch the previous night. Nafiz came upstairs and "wanted to fool around." She kept telling him "no," and he got mad. Nafiz started shouting at her "and then slapped her across the face." Nevean testified that the children woke up because Nafiz "kept getting louder." Their two sons came into the room and told Nafiz to "stop." Nevean said that all of the children were crying and were scared. Nevean testified that Nafiz starting pulling her hair, dragging her into the hallway, and "all across the hallway and he hit [her] in the hallway." The children were all there, crying and telling him to stop.

**{¶26}** Nevean testified that she made it downstairs. She grabbed the telephone to call for help, but Nafiz took the phone from her and threw it, breaking it. Nafiz then dragged her toward

her family room. The "kids were all around, and they saw everything." Nevean stated that at that point, Nafiz

> took me like with his arm and he like head locked me, and choked me that I couldn't breathe, and I peed on myself. And my two sons jumped on top of him to make him stop, and [they] told him to stop. He pushed them away and hits my older son[.]

Nevean explained that Nafiz "got off [her] neck" when he heard the phone ring. One of their daughters had called 911, but then hung up; the 911 operator called back, asking if everything was okay. Nafiz answered the phone and told the 911 operator that the call was an accident.

{¶27} Nevean and the children went outside; Nevean thought that the police would come. But it was cold and no one came, so they went back inside and went upstairs. Nevean stated that she and all of the children were on her bed when Nafiz came into the bedroom. She then testified:

> And then he kept, that's when he went on a rampage, he broke everything that was on the dresser mirror, he just dropped everything and broke it. And there was a glass piggy bank like he took and he smashed down. * * * At one point he wanted to take the dresser mirror and slam it on me and my children, and we were all crying and they were so scared. And they were just frightened and he wouldn't stop. And at one point, he broke like, he broke everything on the dresser and then he wanted to take the dresser mirror and like tilt it over us and drop it on top of us and we were all, me and my * * *, she was 11 months at that time, my baby was on the bed but it was too heavy because it was bolted to the dresser. * * * And then he went to the headboard of the bed and then he started hitting, like pounding it, pounding it, pounding it up against the wall until the bed broke. And we were all on the bed. And my kids were just crying and crying and crying, telling him to stop, and he wouldn't stop and was telling him to stop and he wouldn't stop.

{¶28} Nevean said that Nafiz broke the computer screen in the office. He went into one of the children's rooms and broke a fan. He went downstairs and broke a vase that was in the foyer. He also broke another vase in the living room.

{¶29} Nevean testified that at one point, one of her daughters began to have an anxiety attack; the daughter's hand "turned stiff" and "her heart was racing and she turned pale." Nafiz accused the daughter of "faking it," telling her that she was just like her mom.

{¶30} At another point, Nevean stated that Nafiz began to ask the children which one of them called the police. They would not say. He told them, "I'm not your father anymore, do not ask me for anything." Nafiz left the house, but came back with a cup of coffee. Nevean let him in the house because she thought she had to. Nafiz went to work around 9:00 or 9:30 a.m. Nevean called her parents after Nafiz went to work. She called the police later that day.

{¶31} Nevean testified to previous incidents of domestic violence, stating that Nafiz choked her with a phone cord in 2008, and many other times hit her, pulled her hair, and dragged her. Nevean also testified that Nafiz's family had been harassing her and the children. And Nevean testified to events that led to Nafiz being charged with and convicted (in June 2013) of violating the TPO.

{¶32} Nafiz's version of the January 2, 2013 events was completely different than Nevean's. Nafiz testified that he had been sleeping on the couch because he and his wife had been arguing. Around 4:30 or 5:00 a.m., Nafiz wanted to make things right with his wife. So he went into their bedroom, moved their 11-month-old daughter to her crib, and attempted to cover his wife and himself with a blanket. At that point, Nevean "elbowed [him] right in [his] neck." This made him "furious," so he started ripping up pictures. He stated that he also knocked over everything that was on the dresser. Nafiz testified that Nevean began "clawing" him when he said he wanted a divorce. He stated that he went downstairs to get away from her, dropping the vase in the foyer to prevent her from following him. Nafiz stated that Nevean kept screaming at him. Nafiz testified that he "kept on damaging the house" so that she would stop

following him. He said that he threw another vase down in the family room, as well as their computer monitor. Nafiz testified that they ended up back in their bedroom. According to Nafiz, Nevean kept hitting him. Nafiz said he tried to restrain her, but she "fell on her own." At this point, Nafiz stated that the children were still sleeping. But at some point, their son came into the room, saw Nafiz trying to restrain Nevean, and told Nafiz to "stop, Dad, stop." Nafiz denied that he ever hit, slapped, or choked Nevean. Nafiz admitted that in June 2013, he was convicted of violating the TPO.

### Analysis

**{¶33}** After review, we find that there was sufficient credible evidence presented to establish that Nafiz committed an act of domestic violence by using threats of force to place Nevean in reasonable fear of imminent serious physical harm for herself and the five children. We further find that there was sufficient credible evidence that Nafiz committed an act of domestic violence against the five children in that he recklessly created a substantial risk to their health or safety.

**{¶34}** The magistrate found that Officer Woehrman testified credibly, as did Nevean. The magistrate further found that Nafiz testified with very little credibility, stating that "[h]e essentially denied that anything took place and placed the blame upon Petitioner and her family," and "he stated that his daughter must have been trained or manipulated to call 911."

**{¶35}** We note that the credibility of the witnesses are matters primarily for the trier of fact. *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). We must presume that the findings of the trial court are correct because the trial court can view the witnesses and weigh the credibility of the proffered testimony. *Id*. Indeed, it is the job of the factfinder to resolve disputes of fact and weigh the credibility of the testimony and evidence.

*Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990). We are mindful, therefore, of our responsibility to give deference to these factual findings of the trial court. *See C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶36} Nevean presented testimony that the two sons were present when their father slapped their mother; the two sons told him to stop. All of the children were present as their father dragged their mother down the hallway by her hair. All of the children were present when their father was choking their mother, to the point where Nevean could not breathe and she urinated on herself. At that point, two of the sons jumped on Nafiz to try to get him to stop choking their mother. The children were also present as Nafiz proceeded to throw and break many items in the home, causing broken glass or ceramic to be all over the house.

{¶37} Nevean also presented testimony that the children were present when Nafiz went on a rampage in the bedroom, smashing everything that was on the dresser. Nevean testified that Nafiz attempted to, but was unable to, "take the dresser mirror and slam it on [her] and [the] children," who were on the bed; Nevean said the children were "all crying and so scared." Nevean further testified that as she and the children were still on the bed, Nafiz then began "hitting" and "pounding" the headboard of the bed up against the wall until it broke. Nevean said the children "were just crying and crying and crying, telling him to stop." At one point, one of the daughters experienced an anxiety attack. Nevean said that her daughter "turned stiff" and "her heart was racing and she turned pale."

{¶38} This evidence supports the magistrate's finding that Nafiz committed acts that amounted to threats of force that "placed [Nevean] in fear of imminent serious physical harm for both herself and the parties' children." Although past acts of violence help establish reasonable fear, the magistrate could have found reasonable fear in this case without the past acts of

violence. Indeed, the fact that the past acts did not involve the children does not negate that the fact that here, the children were in the line of fire of the father's "rampage" and physical abuse against Nevean. Nevean's fear of imminent serious physical harm for her and the children was reasonable.

{¶39} These facts also establish that the children were endangered children because Nafiz recklessly created a substantial risk to their health and safety, making them abused children as defined in R.C. 2151.031(B) and 2919.22(A) (defining an "abused child" as an "endangered child"). Therefore, Nevean established by a preponderance of the evidence that Nafiz engaged in acts or threats of domestic violence against the children because he committed acts that resulted in the children being abused children.

{¶40} Nafiz contends that because the children were not injured, they could not be abused children because there was never any "'substantial risk' to the health or safety of [the] children sitting on the bed." But physical injury is not required to establish that a child is an abused child under R.C. 2151.031(B) when the child is an "endangered child" under R.C. 2919.22. *See State v. Griffin*, 5th Dist. Stark No. 2013CA00128, 2014-Ohio-690 (mother convicted of child endangering after she allowed her ex-boyfriend to come into her home when her two children were present; the ex-boyfriend had previously held a knife to mother's throat and she had obtained a CPO against him).

{¶41} The children in this case were subjected to a period of complete terror because of their father's actions. They witnessed their father hit their mother, drag her by her hair, and choke her to the point where she could not breathe and urinated on herself; two of the sons even jumped on their father attempting to get him off of their mother. Nafiz continued to go on a "rampage" while the children were on their parents' bed with their mother, smashing everything

on the dresser, threatening to knock the "dresser mirror" onto all of them, and pounding the headboard of the bed when they were all on it to the point of breaking it. Even without physically injuring the children, Nafiz's actions most certainly created a substantial risk to their health and their safety.

{¶42} Accordingly, Nafiz's first assignment of error is overruled.

Duration of the CPO

{¶43} In his second assignment of error, Nafiz contends that the trial court abused its discretion "by granting a CPO as to the children for the statutory maximum [of five years] and refusing to consider a lesser duration." He maintains that not being able to see his children until July 18, 2018 "will destroy his relationship with his children and theirs to their father."

{¶44} After review, we find no abuse of discretion of the part of the trial court. Based on the facts of this case, the trial court was well within its discretion to order that the CPO remain in effect for the maximum statutory time.

{¶45} If the situation changes, the court can modify the CPO under R.C. 3113.31(E)(8)(b). This provision provides that "[e]ither the petitioner or the respondent of the original protection order * * * may bring a motion for modification or termination of a protection order." Under this section, the moving party has the burden of proof and must show,

> by a preponderance of the evidence, that modification or termination of the protection order or consent agreement is appropriate because either the protection order or consent agreement is no longer needed or because the terms of the original protection order or consent agreement are no longer appropriate.

We note, however, before the trial court can modify a CPO, it must consider the extensive list of factors set forth in R.C. 3113.31(E)(8)(c) to ensure that the petitioner and protected persons under the order are safe.

{¶46} Further, R.C. 3113.31(E)(3)(b) provides that any order issued in a CPO regarding parental rights and responsibilities and visitation shall terminate "on the date a court in an action for divorce, dissolution of marriage, or legal separation brought by either party issues an order allocating parental rights and responsibilities to the care of the children."

{¶47} Here, although the trial court granted Nevean temporary parental rights and responsibilities, it ordered that "temporary custody" was subject to any order issued in the divorce case. The trial court further ordered that visitation would be handled in the parties' divorce action, which had been pending almost since the date the domestic violence occurred.

{¶48} Thus, through the parties' ongoing divorce case, where the issues of custody and visitation can be more thoroughly addressed, Nafiz can attempt to obtain visitation rights with his children. In light of R.C. 3113.31(E)(3)(b), we find the trial court's actions to be proper and prudent.

{¶49} Accordingly, Nafiz's second assignment of error is overruled.

{¶50} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Domestic Relations Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

MARY J. BOYLE, ADMINISTRATIVE JUDGE

KATHLEEN ANN KEOUGH, J., and
PATRICIA ANN BLACKMON, J., CONCUR