[Cite as *S.M. v. T.G.*, 2025-Ohio-1448.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| S.M., | : | |
| Petitioner-Appellee, | : | No. 114084 |
| v. | : | |
| T.G., | : | |
| Respondent-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** April 24, 2025

Civil Appeal from the Cuyahoga County Common Pleas Court
Case No. CV-24-996628

*Appearances:*

S.M., *pro se.*

Patituce & Associates, LLC, and Catherine Purdum, *for appellant*.

MICHELLE J. SHEEHAN, P.J.:

{¶ 1} Respondent-appellant, T.G., appeals from the trial court's judgment granting a civil stalking protection order ("CSPO") to petitioner-appellee, S.M., for three years. T.G. raises one assignment of error for our review, arguing that the trial court erred when it granted the CSPO against him. After review, we conclude that

the record lacks sufficient, credible evidence to establish, by a preponderance of the evidence, that T.G. knowingly engaged in a pattern of conduct to cause S.M. to believe that he was going to physically harm her or cause her mental distress. We therefore reverse the trial court's judgment.

## I. Procedural History and Facts

{¶ 2} S.M. filed a petition for a CSPO against T.G. on April 29, 2024, claiming that she and her boyfriend, who lived with her, needed to be protected from T.G. The trial court granted an ex parte CSPO that same day and scheduled the matter for a full hearing, which it ultimately held on June 16, 2024. The following evidence was submitted at the full hearing.

{¶ 3} S.M. testified that T.G. lives adjacent to her and her boyfriend. During the week of April 15, 2024, S.M. noticed feces in her front yard and on the sidewalk in front of the home located on the other side of T.G. S.M. did not see feces in front of T.G.'s home. S.M. said that the feces "multipl[ied] into piles, splayed sporadically throughout our front yard." She and her boyfriend took photos of the feces and then cleaned it up.

{¶ 4} About a week later, S.M. and her boyfriend noticed more feces and a dead cardinal in their yard. S.M. said they also noticed more feces and a dead bird in front of the home located on the other side of T.G., but no other homes in the neighborhood had feces or dead birds in their front yard or on their sidewalk.

**{¶ 5}** A couple of days later, S.M. and her boyfriend noticed more feces in their front yard. They took photos, cleaned it up, and then called the police. They reported their concerns to the police.

**{¶ 6}** A few days after speaking to the police, S.M. said that at around 4:30 p.m. on April 24, 2024, her boyfriend "caught footage of [T.G.] fondling himself over his jeans facing our home-security camera that we have." They called the police again. A different police officer came to their house and took their statement. The officer suggested they file a protection order, which they did in late April.

**{¶ 7}** S.M. said that on May 11, 2024, she noticed T.G. driving "very slowly" past their home. She said that their home-security camera captured it on video. She called the police again. The police officer told them that he would park on their street and monitor the area.

**{¶ 8}** A month later, the neighbors who live on the other side of T.G. sent S.M. and her boyfriend video footage from their security camera recorded on June 12, 2024, which showed T.G. walking across the street around 5:00 a.m., holding what appeared to be a box. S.M. explained that the video shows T.G. hiding behind a tree across the street and then standing in the middle of the road. T.G. then walked towards his driveway. S.M. stated that when T.G. reached his driveway, he "stops and appears to be doing a gesture while facing our home." S.M. called the police. A police officer came to their house, and they showed the officer the video footage. The officer told them that it appeared as if T.G. was "wandering."

{¶ 9} S.M. testified that she and her boyfriend feared for their safety. She said that she was home alone when these events took place. She explained that she had every right to feel uncomfortable and fear for her safety when T.G. fondles himself while facing her home. She stated that she has heard stories of T.G. "terrorizing the neighborhood for years" and harassing and stalking other neighbors.

{¶ 10} S.M. identified several photos and videos, which she said depicted what she testified to in court. She described each photo to the court and played the videos, also describing what they showed. S.M. explained that several videos show T.G. "wandering" and "standing in the middle of street" after she had obtained the emergency protection order against him. S.M. described a video recorded on June 12, 2024, as showing T.G. standing in his driveway and doing some "form of a gesture facing" her and her boyfriend's home and security camera. She believed that T.G. was "pushing the boundaries again regarding the distance he needs to keep from us."

{¶ 11} S.M. admitted on cross-examination that she did not have any videos of T.G. placing feces or dead birds in her front yard. But she said that T.G. has dogs, which he usually walks at night. She admitted that the feces never made her fear for her safety. She explained that she had lived in her house for five years, and T.G. had lived in his house for around 20 years. She agreed that they had never had a negative conversation. She never sought therapy or counseling because of T.G., never started any medications because of him, and never changed the way she went about her day

because of T.G. S.M. also agreed that when T.G. was driving slowly past her house, he turned into his driveway, and that it was reasonable to believe that he "was just going home." She further agreed that the police did not charge T.G. with any crimes related to her complaints.

{¶ 12} T.G. testified that he does not fondle himself. He said that he "was probably scratching himself" in the video. He stated that he is "74 years old," has "erectile dysfunction," and is "gay" so he does not "get [his] jollies off looking at windows" and "fondling himself." He explained that he had been in jail and "probably got STDs."

{¶ 13} S.M. asked T.G on cross-examination why he faced her house when he did "that." T.G. said that he "was probably watching an activity down the street." He said that he is friends with another neighbor whose daughter watches his dogs when he is away. He said that sometimes he and his friend wave to each other.

{¶ 14} The trial court found that there was not sufficient evidence to establish that T.G. had anything to do with placing the feces in S.M. and her boyfriend's yard. But the trial court found that there was sufficient evidence establishing that T.G. faced S.M. and her boyfriend's home and "touch[ed] his genital regions" and another where he made a "gesture . . . looking, again, right towards their house." The trial court concluded that these two incidents were sufficient to find that S.M. suffered "mental anguish" and "fear of her safety." The court granted S.M.'s request for a CSPO and ordered that it be effective for three years. It is this judgment from which T.G. appeals.

## II. Law and Analysis

### A. Standard of Review

{¶ 15} In *Reynolds v. White*, 1999 Ohio App. LEXIS 4454 (Sept. 23, 1999 8th Dist.), this court explained that because the Ohio Supreme Court had not "articulated" the standard for reviewing civil protection orders, "there [had] been some noted inconsistency among appellate courts." *Id.* at *8. Some courts had been reviewing protection orders for abuse of discretion, some had been considering whether the judgment was supported by competent credible evidence, and others had applied some combination of the two. *Id.* at *9-10 (citing to many cases from Ohio appellate courts for each standard of review).

{¶ 16} But in *Felton v. Felton*, 79 Ohio St.3d 34 (1997), the Ohio Supreme Court gave us some guidance on what that review should be. After setting forth the burden of proof required to obtain a civil protection order, i.e., preponderance of the evidence, the Supreme Court went on to review whether the trial court had correctly denied the petitioner's request for the protection order. Although the Court did not explicitly set forth the standard of review, it reviewed the evidence presented at the full hearing and concluded that "the record show[ed] sufficient, credible evidence to support a finding that [petitioner] was in danger of domestic violence" under R.C. 3113.31(A)(1). *Id.* at 43. The Supreme Court reversed the trial court because it had denied the petitioner a civil protection order despite the fact "that the evidence presented by the appellant was sufficient to meet the preponderance-of-the-evidence standard." *Id.* at 44.

{¶ 17} After considering *Felton*, this court set forth a case-specific approach regarding the standard appellate courts should apply when reviewing challenges to civil protection orders, reasoning that the "standard of review must depend on the nature of the challenge to the protection order." *Reynolds* at *10. We explained that because trial courts have broad discretion to "craft protection orders that are tailored to particular circumstances, it follows that the trial court has discretion in establishing the scope of a protection order and that judgment ought not be disturbed absent an abuse of discretion." *Id.* But when the issue is whether a protection order should have been issued at all, "the question on review is whether there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence." *Id.* at *11, citing *Felton* at 43-44.

{¶ 18} We note that the requirements for obtaining a civil stalking protection order and a domestic violence civil protection order are very similar. *Reising v. Reising*, 2017-Ohio-2859, ¶ 14 (8th Dist.), citing *Schneider v. Razek*, 2015-Ohio-410 (8th Dist.) (R.C. 3113.31, the statute providing for domestic violence civil protection orders, is similar to R.C. 2903.214, the statute providing for civil stalking protection orders); *K.H. v. P.M.*, 2025-Ohio-263, ¶ 72 (6th Dist.), quoting *Denney v. Sanders*, 2016-Ohio-5113, ¶ 15 (1st Dist.) ("Dating and domestic violence CPOs under R.C. 3113.31 and stalking CPOs under R.C. 2903.214 are 'substantially similar.'"). Thus, the reasoning in *Felton* and *Reynolds*, 1999 Ohio App. LEXIS 4454, addressing domestic violence civil protection orders also applies to civil stalking protection orders.

{¶ 19} This court applied the case-specific standard of review set forth in *Reynolds* for several years. *Abuhamda-Sliman v. Sliman*, 2005-Ohio-2836, ¶ 8-10 (8th Dist.) ("We think our standard of review must depend on the nature of the challenge to the protection order."); *Abriani v. Abriani*, 2007-Ohio-3534, ¶ 17 (8th Dist.) (same); *Rauser v. Ghaster*, 2009-Ohio-5698, ¶ 10 (same); *McIntyre v. Johnson-Estes*, 2011-Ohio-1696, *6-7 (same); *Allan v. Allan*, 2014-Ohio-5039, ¶ 11 (8th Dist.) (same); *Corrao v. Corrao*, 2016-Ohio-4862, ¶ 16 (8th Dist.) (same); *M.D. v. M.D.*, 2018-Ohio-4218, ¶ 45 (same); *L.T.C. v. G.A.C.*, 2019-Ohio-789, ¶ 9 (8th Dist.) (same). Many other districts followed our case-specific approach as well. *Deney* at ¶ 16 (1st Dist.); *Young v. Young*, 2006-Ohio-978, ¶ 17-22 (2d Dist.); *Walters v. Walters*, 2002-Ohio-6455, ¶ 9-10 (4th Dist.); *Gruber v. Hart*, 2007-Ohio-873, ¶ 17 (6th Dist.); *Caban v. Randsome*, 2009-Ohio-1034, ¶ 7 (7th Dist.); *McBride v. McBride*, 2012-Ohio-2146, ¶ 10 (12th Dist.).

{¶ 20} At some point, however, this court began applying an abuse-of-discretion standard when reviewing a trial court's judgment granting or denying a petitioner's request for a civil protection order — sometimes even while we were still applying the case-specific approach. *Rufener v. Hutson*, 2012-Ohio-5061, ¶ 12 (8th Dist.); *McWilliam v. Dickey*, 2013-Ohio-4036, ¶ 22; *Williams v. Flannery*, 2015-Ohio-2040, ¶ 6; *J.K. v. D.F.A.*, 2018-Ohio-4424, ¶ 6 (8th Dist.); *D.H. v. J.C.*, 2020-Ohio-112, ¶ 16; *R.W.B. v. T.V.*, 2024-Ohio-584, ¶ 13 (8th Dist.).

{¶ 21} However, an abuse-of-discretion standard implies that trial courts have discretion to abuse. *Rohde v. Farmer*, 23 Ohio St.2d 82, 89 (1970) ("The

concept of 'abuse of discretion' as the basis for determining 'error' of the trial court connotes the right to exercise a sound discretion."). Abuse of discretion also implies that trial courts have a range of choices when making their decision. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985), quoting *State v. Jenkins*, 15 Ohio St.3d 164, 222 (1984) ("'The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations.'"); *State v. Hackett*, 2020-Ohio-6699, ¶ 19 ("A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices.").

{¶ 22} For example, this court applies an abuse-of-discretion standard when reviewing decisions made by a trial court in overseeing its courtroom or in maintaining the progress of trial. *Holly v. Greater Cleveland Regional Transit Auth.*, 2022-Ohio-3236 (8th Dist.) (whether to admit or exclude evidence); *Gangale v. Coyne*, 2022-Ohio-196 (8th Dist.) (discovery matters); *State ex rel. Keenan v. Calabrese*, 69 Ohio St.3d 176 (8th Dist. 1994) (disqualifying counsel); *State v. Nelson*, 2014-Ohio-2189 (8th Dist.) (accepting or rejecting a negotiated plea); *State ex rel. Cincinnati v. Hunter*, 2013-Ohio-5614 (8th Dist.) (contempt proceedings); *Bank of Am., N.A. v. Williams*, 2017-Ohio-7166 (8th Dist.) (managing its docket). We also apply an abuse-of-discretion standard when reviewing cases involving domestic matters. *Kevdzija v. Kevdzija*, 2006-Ohio-1723, ¶ 6 (8th Dist.); *In re D.T.*, 2014-Ohio-4818, ¶ 22, quoting *In re E.A.*, 2013-Ohio-1193, ¶ 10 (8th Dist.), quoting *Davis v. Flickinger*, 77 Ohio St.3d 415 ("Because custody determinations "'are some

of the most difficult and agonizing decisions a trial judge must make,'" a trial judge must have broad discretion in considering all of the evidence."); *Smith v. Smith*, 2022-Ohio-299, ¶ 20 (8th Dist.) (trial courts must have discretion to do what is equitable based on the facts and circumstances of each case). There are also other situations when a trial court has sound discretion to decide the matter before it. But that is not the case when it comes to civil protection orders.

{¶ 23} Notably, the Ohio Supreme Court has never applied an abuse-of-discretion standard when reviewing whether a trial court erred in granting or denying a civil protection order. However, several appellate courts, including this court, have cited to *Parrish v. Parrish*, 95 Ohio St.3d 1201 (2002), for the proposition that the Supreme Court has held that our standard of review when determining whether a trial court properly granted or denied a protection order is abuse of discretion. *E.A. v. A.A.*, 2024-Ohio-2807, ¶ 37 (8th Dist.); *Estrada v. Inman*, 2024-Ohio-1390, ¶ 16 (2d Dist.); *Brubaker v. Farr*, 2006-Ohio-2001, ¶ 16 (3d Dist.); *R.S. v. S.S.*, 2021-Ohio-1384, ¶ 4 (10th Dist.). But the Supreme Court never did so. In fact, the Supreme Court did not render any opinion in *Parrish* because it dismissed the appeal as being improvidently accepted. *Id.* at 1201.

{¶ 24} One justice in *Parrish* dissented, however, believing that there was a "critical issue at stake" regarding whether a trial court abuses its discretion when it excludes evidence that the respondent also abused family members "other than those for whom the protection order [was] sought." *Id.* at 1201, 1204 (Stratton, J., dissenting). In analyzing this question, the dissenting justice noted that "[t]he

decision whether to grant a civil protection order lies within the sound discretion of the trial court." *Id.* at 1204, citing *Deacon v. Landers*, 68 Ohio App.3d 26 (4th Dist. 1990). A dissent to an appeal being dismissed as improvidently accepted, however, is not law. Moreover, after *Felton*, 79 Ohio St.3d 34, the Fourth District held that *Deacon* was no longer good law and did not set forth the appropriate standard of review. *Gooderham v. Patterson*, 1999 Ohio App. LEXIS 5438, *2 (4th Dist. Nov. 9, 1999). Thus, citing to *Parrish* for the proposition that the standard for reviewing civil protection orders is abuse of discretion is not accurate.

{¶ 25} We note, however, that a cursory review of our cases applying an abuse-of-discretion standard reveals that we do not always review for an abuse of discretion — despite explicitly stating that is what we are applying. In many of these cases, we reviewed the case to determine whether there was competent, credible evidence or sufficient, competent evidence to support the trial court's decision. *See Rufener*, 2012-Ohio-5061, at ¶ 12-23 (8th Dist.) (stated that our standard of review was abuse of discretion but concluded that there was "an absence of competent, credible evidence" to support the trial court's finding that the respondent engaged in menacing by stalking, and therefore, the trial court's decision was against the manifest weight of the evidence); *Williams*, 2015-Ohio-2040, at ¶ 6-7 (stated our standard of review was abuse of discretion but then said, "On appeal, we consider whether there is some competent, credible evidence to support each element of menacing by stalking."); *S.H.B. v. M.W.L.*, 2021-Ohio-3929, ¶ 13 (8th Dist.) (stated that the decision whether to grant a civil protection order lies within the sound

discretion of the trial court but then said, "When a respondent argues that the trial court erred in issuing a protection order, the question on appeal is whether there was sufficient credible evidence to support a finding that the respondent had engaged in acts or threats of domestic violence."); *J.A.C. v. A.L.*, 2022-Ohio-2275, ¶ 15 (stated that we review a trial court's decision to grant a CSPO under an abuse-of-discretion standard but also said that a trial court's decision is proper if there is competent, credible evidence supporting each element of menacing by stalking); *M.J.W. v. T.S.*, 2019-Ohio-3573, ¶ 26, quoting *Strausser v. White*, 2009-Ohio-3597, ¶ 33 (stated that our review is abuse of discretion but then said, "[T]he question before us is whether there was 'some competent, credible evidence to support each element of menacing by stalking.'").

{¶ 26} Thus, it is clear from reviewing the case law set forth in this district as well as others that our standard when reviewing a trial court's decision on whether to grant or deny a civil protection order is not an abuse of discretion. Accordingly, going forward, when the question on appeal is whether the trial court's decision to grant or deny a civil protection order — whether it is a domestic violence civil protection order or civil stalking protection order — our standard of review is whether there was sufficient, credible evidence to support a finding that the respondent engaged either in acts of domestic violence or acts of menacing by stalking against the petitioner. *Reynolds*, 1999 Ohio App. LEXIS 4454, at *11, citing *Felton*, 79 Ohio St.3d at 43. But if the scope and terms of a civil protection order are at issue, then we review for an abuse of discretion. *Reynolds*, at *10.

**B. Pattern of Conduct and Knowingly**

{¶ 27} In his sole assignment of error, T.G. argues that the trial court erred when it granted the CSPO to S.M. He argues that the evidence did not establish a pattern of conduct or that he acted knowingly.

{¶ 28} A petitioner can request a CSPO by filing a petition alleging that the respondent violated menacing by stalking under R.C. 2903.211. *R.W.B. v. T.V.*, 2024-Ohio-584, ¶ 13 (8th Dist.), citing R.C. 2903.214. R.C. 2903.211 states, in relevant part, that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person . . . or cause mental distress to the other person . . . ." R.C. 2903.211(A)(1).

{¶ 29} To obtain the CSPO, the petitioner must establish, by a preponderance of the evidence, that the respondent committed a violation of R.C. 2903.211. *R.R. v. J.H.*, 2021-Ohio-706, ¶ 27 (8th Dist.). "Preponderance of the evidence" is "the greater weight of the evidence, or evidence that leads the trier of fact to find that the existence of a contested fact is more probable than its nonexistence." *State v. Stumpf*, 32 Ohio St.3d 95, 102 (1987).

{¶ 30} A "pattern of conduct" exists when there are "two or more actions or incidents closely related in time." R.C. 2903.211(D)(1). "'In determining what constitutes a pattern of conduct, courts must take every action of the respondent into consideration, even if some of the actions in isolation do not seem particularly

threatening.'" *R.W.B.* at ¶ 15, quoting *Lewis v. Jacobs*, 2013-Ohio-3461, ¶ 10 (2d Dist.).

{¶ 31} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 32} In this case, the trial court found that T.G. committed two acts that amounted to a pattern of conduct, namely, when T.G. fondled himself towards S.M. and her boyfriend's home and when T.G. made some sort of gesture towards their home. We agree with the trial court that the video showing T.G. fondling himself towards their home was sufficient, credible evidence to establish one incident.

{¶ 33} However, we do not agree that the two videos depicting some sort of gesture that T.G. supposedly made towards S.M. and her boyfriend's home were sufficient to establish a second incident. We have independently reviewed the two videos regarding the supposed gesture, i.e., one is footage from the neighbors' security camera who live on the other side of T.G. and one is footage from S.M. and her boyfriend's security camera. First, the videos show that it is dark outside, so it is not easy to see what is happening in either video. Second, the videos are somewhat blurry. T.G. does appear to stop in his driveway for a second, look towards S.M. and her boyfriend's home, and lift his arm for less than a fraction of a second, but he could have just as easily been checking the time as making a gesture. It is simply not

possible to tell from the videos what he was doing nor is there any other evidence in the record to establish what he was doing.

{¶ 34} We have also reviewed the remaining evidence submitted by S.M. Considering this evidence, as we are required to do, we agree with the trial court that none of the other photos, videos, or S.M.'s testimony amounts to an incident that would go towards establishing a pattern of conduct. There is no evidence that T.G. placed the feces in S.M.'s yard. And none of the other evidence, including T.G. walking around the neighborhood, walking or standing in the middle of the street, riding his bike, mowing the grass, or driving slowly past S.M.'s house — which S.M. admitted that T.G. could have been driving slowly to turn into his driveway, which is right next to her house — is sufficient conduct to establish a pattern of anything directed towards S.M. or her boyfriend.

{¶ 35} We also agree with T.G. that S.M. did not establish by a preponderance of the evidence that he acted knowingly. In *State v. Spaulding*, 2016-Ohio-8126, the Ohio Supreme Court held that when proving menacing by stalking, the parties' history is relevant to establishing both a pattern of conduct and that the respondent knew that his conduct would cause the petitioner to believe that he would harm the petitioner or cause the petitioner mental distress. *Id.* at ¶ 72. We find it significant in this case that S.M. and T.G. did not have any negative history with each other. S.M. testified that she had lived in her house for approximately five years, T.G. had lived in his for approximately 20 years, and they had never had a negative conversation, interaction, or argument. There is no evidence that they had

a history of not liking each other. There is also no evidence that T.G. had harassed S.M. or her boyfriend in any way. In fact, there is no evidence that they had ever spoken to each other.

{¶ 36} R.C. 2903.211 criminalizes "specific conduct directed toward another person when done for an illegitimate purpose." *Bey v. Rasawehr*, 2019-Ohio-57, ¶ 42, *rev'd in part on other grounds*, 2020-Ohio-3301. In the context of a CSPO, a petitioner must establish menacing by stalking by a preponderance of evidence. While we agree that the incident of T.G. fondling himself was sufficient to establish one of the two acts towards proving a pattern of conduct, we do not agree the evidence establishes that T.G. knowingly committed this act to cause S.M. to believe that he would physically harm her or cause her mental distress because it was not specific conduct directed at S.M. While we do not condone T.G.'s fondling himself in public, he did not do it in front of S.M. In fact, he did not do it in front of anyone. He was standing alone in his driveway, and the record does not contain any evidence that T.G. was aware that he was being recorded.

{¶ 37} Simply put, the record does not support the fact that T.G., on more than one occasion, knowingly caused S.M. to believe that he would cause her physical harm or cause her mental distress. One incident of T.G. fondling himself while facing S.M.'s house when no one is watching — and when the record does not reflect that T.G. knew that S.M.'s security cameras recorded everything that he did in his own driveway — is not enough to establish that T.G. knowingly engaged in a pattern of conduct for purposes of menacing by stalking.

{¶ 38} After review, we agree with T.G. that the trial court erred when it granted the CSPO to S.M.  Thus, we sustain T.G.'s sole assignment of error.

{¶ 39} Judgment reversed.

It is ordered that appellant recover of appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MARY J. BOYLE, J., CONCUR